PONTIAC SCHOOL DISTRICT v PONTIAC
EDUCATION ASSOCIATION

Docket No. 300555. Submitted December 7, 2011, at Detroit. Decided January 5, 2012, at 9:00 a.m. Leave to appeal denied, 493 Mich 861.

The Pontiac Education Association (PEA) filed an unfair-labor-practice complaint in the Michigan Employment Relations Commission (MERC) after the Pontiac School District laid off occupational therapists (OTs) and physical therapists (PTs) employed by the district who had been represented by the PEA and entered into a contract with a private entity to provide OT and PT services. The school district contended that the OTs and PTs provided "noninstructional support services" and, therefore, under MCL 423.15(3)(f), the school district was not required to enter into collective bargaining with regard to its decision. The PEA contended that the OTs and PTs provided instructional support services and, therefore, the statute did not prevent collective bargaining with regard to the subject. A hearing referee agreed with the PEA and recommended that the charge be upheld. The MERC issued a decision and order adopting the hearing referee's recommendation. The school district appealed.

The Court of Appeals held:

1. The words "noninstructional support services" are not defined in MCL 423.215 and must be given their plain and ordinary meaning. A dictionary defines "non" as a prefix meaning not. It defines "instruction" as the act or practice of instructing or teaching, education, knowledge or information imparted, or the act of furnishing with authoritative directions. Therefore, the term "instruction" is not ambiguous but, rather, is broad in definition because it applies to knowledge or information imparted without placing qualifications or restrictions on the type of knowledge or information imparted. The term is not limited to knowledge or information imparted with regard to the core curriculum of the school. Therefore, positions in which individuals impart knowledge or information to students may be subject to collective bargaining under MCL 423.215(3)(f). The testimony of an OT and a PT showed that they engaged in imparting knowledge and information to students, teachers, and parents. Although the OTs

and the PTs are not certified teachers of the core curriculum, they do instruct certain students with respect to addressing and overcoming problems associated with fine and gross motor skills and work in conjunction with teachers to impart knowledge and information. There was competent, material, and substantial evidence to support the decision of the MERC.

2. The MERC did not rely on the legislative history of MCL 423.215 to reach its conclusion; instead it focused on the plain and unambiguous language of the statute.

3. There is no indication that the Legislature intended state and federal regulations governing special education to apply to public schools generally for purposes of the statute.

4. If an error occurred with regard to the applicable burden of proof, it was not relevant to the ultimate disposition of the case and reversal is not warranted on this ground.

Affirmed.

JANSEN, J., dissenting, stated her belief that the PTs and OTs provide services that are not a component of the traditional, instructional environment of a classroom. The functions performed by the PTs and OTs are not "instructional" within the commonly understood meaning of that term; the services they provide are noninstructional in nature. In the context of special education, the Superintendent of Public Instruction has determined that PTs and OTs provide services that are noninstructional in nature. The judgment of the MERC should be reversed and the matter should be remanded to the MERC for the dismissal of the charge.

1. SCHOOLS — COLLECTIVE BARGAINING — NONINSTRUCTIONAL SUPPORT SERVICES.

Positions in which individuals impart knowledge or information to students may be subject to collective bargaining by a public school employer under the provisions of MCL 423.215(3)(f); there is no requirement that the knowledge or information imparted relate to the core curriculum of the school; collective bargaining cannot include matters pertaining to third-party contracts relative to noninstructional support services.

2. SCHOOLS — COLLECTIVE BARGAINING — WORDS AND PHRASES — NONINSTRUCTIONAL SUPPORT SERVICES.

There is no indication that the Legislature intended state and federal regulations governing special education, which define "instructional services" and "related services," to apply in construing the undefined term "noninstructional support services" in MCL 423.215(3)(f).

*Secrest Wardle* (by *Dennis R. Pollard* and *Mark S. Roberts*) for the Pontiac School District.

*Law Offices of Lee & Correll* (by *Michael K. Lee* and *Erika P. Thorn*) for the Pontiac Education Association.

Before: MURPHY, C.J., and JANSEN and OWENS, JJ.

MURPHY, C.J. Respondent, Pontiac School District ("school district" or "district"), appeals as of right the decision by the Michigan Employment Relations Commission (MERC) finding in favor of the charging party, Pontiac Education Association (PEA), and against the school district, with respect to the PEA's unfair-labor-practice complaint. We affirm.

In May 2004, the school district chose to privatize services through a third-party contract with respect to services that had been provided by occupational therapists (OTs) and physical therapists (PTs) employed by the district. The PEA, which represented the OTs and PTs, asserted that the school district could not unilaterally act because the issue was subject to bargaining under the parties' collective-bargaining agreement. Nonetheless, the school district laid off the OTs and PTs and entered into a contract with a private entity to provide OT and PT services. Consequently, the PEA filed an unfair-labor-practice complaint. The dispute in this case concerns the interpretation of MCL 423.215(3)(f), which provides that "[c]ollective bargaining between a public school employer and a bargaining representative of its employees shall not include . . . [t]he decision of whether or not to contract with a third party for 1 or more *noninstructional support services . . . .*" (Emphasis added.) Noninstructional support services could therefore be contracted out to third parties without collective bargaining on the subject. The PEA argues that OTs and PTs do not provide noninstruc-

tional support services, or, stated otherwise, the PEA contends that OTs and PTs provide instructional support services. The school district contends that OTs and PTs provide noninstructional support services; therefore, collective bargaining played no role when the district chose to privatize those services.[1]

An evidentiary hearing was held before a hearing referee. The PEA presented testimony from an OT and PT regarding their responsibilities while employed by

---

[1] The school district has filed a supplemental authority, asserting that a recent amendment of MCL 423.215, pursuant to 2011 PA 103, requires us to reject the MERC's remedy. The newly enacted MCL 423.215(3)(k) precludes collective bargaining with respect to decisions concerning a "reduction in force" or "any other personnel determination resulting in the elimination of a position . . . ." MCL 423.215(3)(f), with which we are concerned, was not amended under 2011 PA 103. Given that subsection (3)(f) was not amended and that, perhaps arguably, this case does not truly involve a reduction in force or the elimination of positions but rather the replacement or substitution of school OTs and PTs with privately contracted OTs and PTs at a lesser cost, we question whether MCL 423.215(3)(k) has the effect argued by the school district. Regardless, we need not resolve the proper construction of the amendatory language, because we hold that MCL 423.215(3)(k) operates prospectively only. Whether an amendment to a statute applies retroactively presents a question of law subject to review de novo. *Brewer v A D Transp Express, Inc*, 486 Mich 50, 53; 782 NW2d 475 (2010). To determine whether a statute should be applied retroactively or prospectively only, the primary rule is that the legislative intent must govern. *Id*. at 55-56. This principle prevails over all other rules of construction and operation. *Id*. at 56. An amendment to a statute is presumed to operate prospectively only. *Davis v State Employees' Retirement Bd*, 272 Mich App 151, 155; 725 NW2d 56 (2006). "The Legislature's expression of an intent to have a statute apply retroactively must be clear, direct, and unequivocal as appears from the context of the statute itself." *Id*. at 155-156. Retroactive application of a statute may not occur if the amendment "abrogates or impairs vested rights, creates new obligations, or attaches new disabilities concerning transactions or considerations occurring in the past." *Id*. at 158. In the present case, the effective date of 2011 PA 103 is stated as July 19, 2011, and there is no clear, direct, and unequivocal evidence of the Legislature's intent to abrogate the rights and remedies for this unfair-labor charge filed in 2004. Accordingly, we will address the merits of the school district's claim of appeal.

the school district. These individuals testified that they identified students' needs with regard to physical limitations and fine motor skills, identified the manner in which to treat or correct the problem, obtained the necessary materials to alleviate the problem, addressed the problem in therapy, and recruited teachers and parents to continue the therapy in the classroom or home setting. The OTs and PTs had continual contact with teachers and parents regarding student difficulties and the manner in which to address the obstacles. The testimony reflected that OTs and PTs provided students with training and instruction in the skills necessary for them to learn core-curriculum subjects. On the contrary, the school district presented testimony from its administrators that OTs and PTs were not certified teachers, could not provide instruction, and did not aid in the core curriculum. The school district also asserted that state and federal regulations did not include OTs and PTs as individuals providing instructional services. The hearing referee weighed the testimony, utilized the rules of statutory construction, and examined the legislative history and the regulations. The hearing referee, in recommending that the unfair-labor charge be upheld, concluded that the services provided by OTs and PTs were subject to collective bargaining, because they did not provide noninstructional support services; rather, the OTs and PTs provided instructional support services. The MERC issued its decision and order, adopting the hearing referee's recommendation. The school district appeals as of right pursuant to MCL 423.216(e).

The school district contends that the MERC erred by concluding that OTs and PTs did not constitute "noninstructional support staff" and that the negative employment action should have been the subject of collective bargaining. We disagree. The standards governing

our review of MERC rulings were set forth in *Branch Co
Bd of Comm'rs v Int'l Union, United Auto, Aerospace &
Agriculture Implement Workers of America, UAW*, 260
Mich App 189, 192-193; 677 NW2d 333 (2003):

> We review MERC decisions pursuant to Const 1963, art
> 6, § 28, and MCL 423.216(e). MERC's findings of fact are
> conclusive if they are supported by competent, material,
> and substantial evidence on the record considered as a
> whole. MERC's legal determinations may not be disturbed
> unless they violate a constitutional or statutory provision
> or they are based on a substantial and material error of law.
> In contrast to . . . MERC's factual findings, its legal rulings
> are afforded a lesser degree of deference because review of
> legal questions remains de novo, even in MERC cases.
> [Citations and quotation marks omitted.]

An agency's interpretation of a statute is not binding
on the courts, and that interpretation cannot conflict
with the Legislature's intent as expressed in the plain
language of the statute. *In re Complaint of Rovas
Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259
(2008). The reviewing court, however, must give " 're-
spectful consideration' " to the agency's construction of
the statute and provide " 'cogent reasons' " for overrul-
ing the agency's interpretation. *Id.*

An issue involving statutory interpretation presents
a question of law reviewed de novo. *Klooster v City of
Charlevoix*, 488 Mich 289, 295-296; 795 NW2d 578
(2011). In *Krohn v Home-Owners Ins Co*, 490 Mich 145,
156-157; 802 NW2d 281 (2011), our Supreme Court,
reiterating the well-established principles of statutory
construction, recently stated:

> The primary goal of statutory interpretation is to ascer-
> tain the legislative intent that may reasonably be inferred
> from the statutory language. The first step in that deter-
> mination is to review the language of the statute itself.

Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. We may consult dictionary definitions to give words their common and ordinary meaning. When given their common and ordinary meaning, the words of a statute provide the most reliable evidence of its intent[.] [Citations and quotation marks omitted.]

Here, the disputed statutory language is found in MCL 423.215, which, at the time of the events at issue, provided, in relevant part, as follows:

(3) Collective bargaining between a public school employer and a bargaining representative of its employees shall not include any of the following subjects:

\*    \*    \*

(f) The decision of whether or not to contract with a third party for 1 or more noninstructional support services; or the procedures for obtaining the contract; or the identity of the third party; or the impact of the contract on individual employees or the bargaining unit.

\*    \*    \*

(4) The matters described in subsection (3) are prohibited subjects of bargaining between a public school employer and a bargaining representative of its employees, and, for the purposes of this act, are within the sole authority of the public school employer to decide.

Therefore, collective bargaining cannot include matters pertaining to third-party contracts relative to noninstructional support services, because such matters would be within the sole authority of the public school employer. Because the statute does not define what constitutes "noninstructional support services," the words should be given their plain and ordinary meaning, which may be ascertained through use of a dictionary. *Krohn*, 490 Mich

at 156. The word "non" is defined as "a prefix meaning 'not,' usu. having a simple negative force, as implying a mere negation or absence of something[.]" *Random House Webster's College Dictionary* (2000). The word "instruction" is defined as "the act or practice of instruction or teaching[,] education . . . [;] knowledge or information imparted . . . [;] [or] the act of furnishing with authoritative directions." *Id.* Consequently, the term "instruction" is not ambiguous, but rather is broad in definition because it applies to "knowledge or information imparted" without placing qualifications or restrictions on the type of knowledge or information imparted. It fails to limit the knowledge or information imparted to the core curriculum, as inaccurately contended by the school district. In sum, positions in which individuals impart knowledge or information to students may be subject to collective bargaining under MCL 423.215(3)(f). We shall now review the testimony of an OT and a PT, which shows that they engaged in imparting knowledge and information to students, teachers, and parents.

Roseanne Bartush was employed by the school district from 1982 to 2004 as an OT. She was a department head from 1994 to 2004, overseeing individuals with teaching certificates. In fact, she oversaw 25 staff members, including paraprofessionals, teachers, OTs, PTs, and speech pathologists. Bartush worked at an elementary school for the last 10 years of her employment with the district. She testified that the beginning of an average day was spent on one or more of the following matters: preparation time (preparing for therapy sessions with students); meetings with teachers; attending Individualized Education Planning (IEP) meetings; answering phone calls from parents; or addressing other related matters. Once school started, Bartush would see students as they arrived for group or

individual therapy sessions. She had 50 to 60 students on her caseload. The informal meetings with teachers usually involved questions about students, classroom activities, progress reports, or concerns. There were a variety and different types of IEP meetings. One type was a review meeting to go over a student's progress through the year involving teachers, therapists, and any others who worked with the student. Bartush was also involved in initial IEP meetings for students identified as having special education needs. The IEP meetings involved sharing reports, making recommendations for therapy, and constructing goals and objectives. Bartush would personally offer goals and objectives and had input into an IEP form or document, which was created or crafted as a result of the meetings and constituted a legal document containing Bartush's objectives along with a teacher's objectives. Bartush had direct contact with parents; she was not required to make contact through a certified teacher. She had daily contact with parents, either informally in the hall when the parents brought the students in to school or when returning the two to three phone calls from parents received during a typical week.

According to Bartush, a student was directed to occupational therapy in different ways. A diagnostic team, that included Bartush, would conduct an initial evaluation to determine if a student was eligible for special education. Also, a student, teacher, parent, or anyone who was concerned about a student's progress or difficulties could ask her to conduct an evaluation. The end result would be a formal plan to share information and determine if therapy was necessary. At Bartush's school, the diagnostic team typically consisted of a speech pathologist and an OT. If there was a physical impairment or significant motor-skills delay, a PT would become involved.

As an OT, Bartush evaluated students for fine motor skills, self care, and sensory processing disorders, and then she would prepare a report. For the data collection and observation, Bartush employed standardized testing. If a student was added to her caseload for treatment, Bartush prepared objectives with the teacher and implemented them on a weekly basis. When treating a group, she prepared activities geared toward the group's needs, and she worked with both the teacher and the paraprofessional in the classroom setting in the hopes that the activities would carry over through the week. For example, Bartush worked in preschool where there were a number of children with physical impairments, such as deficiencies in cutting skills. Bartush would modify the scissors or build an adaptation and leave it in the classroom so the students could work on their skills. Bartush would periodically visit the class to check on the children's progress. Bartush testified that skills such as cutting with scissors served to elevate children in preschool from simple to complex tasks.

Bartush testified that there was also a large population with autism. She played a major role in managing behavior, designing sensory diets, and devising other approaches in order to allow the students to function in the classroom and to allow the staff to manage the students. A fair assessment of Bartush's responsibilities was that she assisted the student in being able to receive instruction from the classroom teacher. During her career, Bartush did provide classroom instruction when she worked with physically impaired high school students for a year or two. The class was not a "core" subject, but rather addressed daily living skills on such matters as cooking and computer usage. Bartush described her duties as an OT as follows: "To make [students] as independent as possible and to function within the classroom to the best of their ability[.]"

Annmarie Kammann worked for the school district as a PT from 1986 until she was laid off in May or June of 2004. When she worked for the school district, her average day started by examining her chart of students who were scheduled for appointments that day. She would identify treatment goals and plans, discuss issues with teachers, and gather any necessary equipment before the children arrived. She aided the children in walking from the bus to the classroom to work on their gait and then she would start individualized treatment. On a typical day, Kammann treated 8 to 10 children with sessions lasting for 30 to 45 minutes. She regularly consulted with teachers, particularly when bringing a new piece of equipment into a classroom. She showed teachers how to use the equipment and when to use it. Kammann also consulted with teachers if students had difficulties. For example, if a child had a posture problem, she might explore wedges or a therapy ball as a solution. Kammann also prepared evaluations at the beginning of the school year, reports for IEP meetings, progress notes for physicians, letters of medical necessity relative to equipment for students, and general correspondence directed to physicians. She also identified short-term and long-term goals and objectives for IEP meetings. Kammann had personal contact with parents of students four to five times a week plus telephone contacts, and these contacts did not occur with a certified teacher as an intermediary. Kammann opined that she contributed from an instructional standpoint because children with attention deficiencies and physical limitations could not learn their academics from teachers until those problems were addressed. Kammann testified that she had daily contacts with teachers to address what was best for the students. She was on the IEP team and had to assess whether her goals and objectives were met.

In her job, Kammann examined a child's head control, trunk control, movement from one place to another, and use of the body to manipulate different things; it was hands-on physical therapy. For example, she would address head control in a sitting position on a therapy ball, address the prone position to allow a child to write, and address walking and balance to allow a student to be mainstreamed in the most efficient manner. Kammann testified that PTs prepare treatment plans that contain short- and long-term goals. When setting these goals, the treatment plan sets forth different activities to perform. It may include instructions for the parents to perform at home. It also involves advising the teachers of how to carry out activities in the classroom. In her therapy room, Kammann had equipment such as crutches, balls, canes, weights, wedges, splints, bikes, standers, and extra walkers. When asked to differentiate between an OT and a PT, she testified that PTs worked on the overall gross motor picture of the child, whereas an OT addressed fine motor skills. Kammann was familiar with what transpired in the classrooms. In her view, there was no difference between the function she performed and classroom teaching.

It is abundantly clear from the record that OTs and PTs, while not being certified teachers of core curriculum, instruct certain students with respect to addressing and overcoming problems associated with fine and gross motor skills. They work in conjunction with teachers to impart knowledge and information. We agree with the observations made by the MERC in the following passage from its ruling, which is supported by competent, material, and substantial evidence on the record:

> The [OTs] and [PTs] are not certified teachers. However, they work closely with certified teachers and other

professional staff, as well as with paraprofessionals in evaluating the needs of students and providing the students with activities and tools that would assist them in the educational process. An [OT] and a [PT], who were previously employed by [the school district], testified at length about their job duties. Their testimony identified a wide range of services that they provided to assist schoolchildren in acquiring and developing skills necessary for them to achieve educational goals. As explained in detail in the [hearing referee's] decision, the therapists would prepare activities for students to assist them in developing certain skills. In addition to working with the students on those activities, the therapists would explain those activities to the classroom teacher and paraprofessionals, so, in the therapists' absence, those employees could continue to assist the students with the activities that were designed to aid the students in acquiring skills necessary to reach their academic goals. While the therapists did not teach the core curriculum, they provided the students with training and instruction in skills necessary for them to learn those subjects taught as part of the core curriculum.[2]

Moreover, like the [hearing referee], we find it particularly relevant that the request for proposals (RFP) prepared by [the school district] in seeking to subcontract the services of the [OTs] and [PTs] stated that the services it sought to obtain from a private contractor were to include: "physical therapy/occupational therapy services" to address disabilities "that interfere with learning in the educational environment." The therapists whose services were sought under [the school district's] RFP were to: plan therapy services "for each individualized education program (IEP) as a member of the multidisciplinary

---

[2] The school district complains that OTs and PTs simply provide services that are physical and not instructional in nature. While there is clearly a physical component to their work, the district's argument fails to appreciate the instructional elements of the work performed by OTs and PTs in the school setting. And again, the school district's argument is based more on a restrictive reading of the statute that confines instruction to instruction on core curriculum, but there is no basis in the statutory language to place such a restriction.

educational/assessment team;" to engage in "consultation
and education;" and to "administer . . . therapy services
within the educational environment." Accordingly, we con-
clude that the services [the school board] sought to con-
tract for in the RFP, and the services previously provided by
the [OTs] and [PTs] in this case, were services of an
instructional nature. Whether they were instructional ser-
vices, or instructional support services, we need not decide,
as they were clearly not "noninstructional support ser-
vices." [Omission in original.]

While the school district's expert witnesses con-
cluded that the OTs and PTs did not provide "instruc-
tion," the duty to interpret and apply the law is allo-
cated to the courts, not the parties' expert witnesses.
*Hottmann v Hottmann*, 226 Mich App 171, 179-180; 572
NW2d 259 (1997). Moreover, regardless of any conflict-
ing evidence, there was nonetheless competent, mate-
rial, and substantial evidence supporting the MERC's
decision.

The school district argues that the hearing referee
and the MERC misinterpreted the legislative history
and failed to apply state and federal regulations govern-
ing special education that define "instructional ser-
vices" and "related services" separately. With respect to
the legislative history of the act, legislative history of
any type is not to be utilized as a tool of interpretation
unless a statute is ambiguous. *In re Certified Question
from the United States Court of Appeals for the Sixth
Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). A
review of the MERC's decision and order reveals that it
did not rely on the legislative history—an early house
bill version of the statute—to reach its conclusion.
Instead, the MERC correctly focused on the plain and
unambiguous language of the statute. Again, the school
district seeks to place limitations on the terms at issue
by arguing that instructional means part of the curricu-

lum, such as teaching a core subject. The Legislature, however, could have defined the phrase "noninstructional support services" in that manner, but chose not to do so.

We also reject the school district's contention that state and federal regulations regarding special education, which define "instructional services" and "related services," should be applied. There is no indication whatsoever in MCL 423.215 that the Legislature intended state and federal regulations governing special education to apply to public schools generally for purposes of the statute.[3] Moreover, the cited regulatory terms are not even the same terms at issue here, and our terms are also being examined in a different context. The school district also points to state and federal regulations defining "physical therapy" and "occupational therapy"; however, these general definitions provide no insight to construing the statute, even assuming that they are contextually relevant, especially where *testimony* was the crucial determinative factor regarding the parameters of the job duties actually performed by the OTs and PTs in the school district on a day-to-day basis.

Finally, the school district maintains that the MERC erred in its application of the burden of proof. This argument does not entitle the district to appellate relief. "The applicable burden of proof presents a question of law that is reviewed de novo on appeal." *FACE Trading, Inc v Dep't of Consumer & Indus Servs*, 270 Mich App 653, 661; 717 NW2d 377 (2006). "The charging party,

___

[3] The argument premised on the regulation defining "instructional services" would require us to find that only teachers provide such services. The Legislature could easily have used limiting language if it intended for all school personnel but teachers to fall into the collective-bargaining exception in MCL 423.215(3)(f), but the Legislature did not do so.

and not MERC, has the burden of establishing the unfair labor practice." *Mich Employment Relations Comm v Reeths-Puffer Sch Dist*, 391 Mich 253, 267 n 20; 215 NW2d 672 (1974). Assuming that there was an error with respect to the applicable burden of proof, it was not relevant to the ultimate disposition of the case. The MERC did not predicate its holding on the school district's failure to meet its alleged burden of proof. Rather, the hearing referee and the MERC appropriately applied the rules of statutory construction. Indeed, the MERC essentially found that the PEA provided evidence establishing that the OTs and PTs did not provide noninstructional support services. Reversal is unwarranted.

Affirmed. The PEA, having fully prevailed on appeal, is awarded taxable costs pursuant to MCR 7.219.

OWENS, J., concurred with MURPHY, C.J.

JANSEN, J. (*dissenting*). Because I believe that physical therapists (PTs) and occupational therapists (OTs) constitute "noninstructional support staff" within the meaning of MCL 423.215(3)(f), I respectfully dissent.

MCL 423.215(3)(f) provided at the time of the events at issue:

> Collective bargaining between a public school employer and a bargaining representative of its employees shall not include any of the following subjects:
>
> *     *     *
>
> (f) The decision of whether or not to contract with a third party for 1 or more noninstructional support services; or the procedures for obtaining the contract; or the identity of the third party; or the impact of the contract on individual employees or the bargaining unit.

It is clear that contracting for "noninstructional support services" is a prohibited subject of collective bargaining between public schools and their employees. MCL 423.215(3)(f); MCL 423.215(4); see also *Mich State AFL-CIO v Employment Relations Comm*, 453 Mich 362, 380; 551 NW2d 165 (1996) (opinion by BRICKLEY, C.J.). However, the Legislature has not defined the phrase "noninstructional support services." When a term or phrase has not been defined by the Legislature, this Court must give the term or phrase its ordinary and commonly understood meaning. MCL 8.3a; *Stanton v Battle Creek*, 466 Mich 611, 617; 647 NW2d 508 (2002).

Although not directly germane to the case at bar, MCL 380.761(1) provides a list of various "noninstructional services" that intermediate school districts are required to address when issuing their reports on the sharing of services. Among others, the statute requires that intermediate school districts consider "[a]ny other *noninstructional services* identified by the superintendent of public instruction." MCL 380.761(1)(m) (emphasis added). Within the context of special education, the Superintendent of Public Instruction has differentiated between "[i]nstructional services," "[o]ccupational therapy," and "[p]hysical therapy." Mich Admin Code, R 340.1701b(a), (c), and (f). In particular, Rule 340.1701b(a) provides that "[i]nstructional services" include only those "services provided by teaching personnel . . . ."

PTs and OTs are not teachers. Instead, they are licensed under part 178 of Michigan's Public Health Code, MCL 333.17801 *et seq.*, and part 183 of Michigan's Public Health Code, MCL 333.18301 *et seq.*, respectively. In other words, at least in the context of special education, the Superintendent of Public Instruc-

tion has determined that PTs and OTs provide services that are *noninstructional* in nature.

I find persuasive this differentiation between instructional services, physical therapy services, and occupational therapy services. Quite simply, the services provided by PTs and OTs are not a component of the traditional, instructional environment of the classroom. Instead, they are specialized services that are provided only for certain students with specific types of disabilities. In short, the functions performed by PTs and OTs are not *instructional* within the commonly understood meaning of that term. It follows, in my opinion, that these services are *noninstructional* in nature.

I conclude that the MERC committed a substantial and material error of law when it determined that physical therapy services and occupational therapy services are not "noninstructional support services" within the meaning of MCL 423.215(3)(f). See *Oak Park Pub Safety Officers Ass'n v Oak Park*, 277 Mich App 317, 324; 745 NW2d 527 (2007). Because physical therapy services and occupational therapy services are "noninstructional support services," MCL 423.215(3)(f), the Pontiac School District was not required to collectively bargain with the Pontiac Education Association before contracting with a private entity to provide PT and OT services. I would reverse the judgment of the MERC and remand for a dismissal of the unfair-labor-practice charge.